## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PENNSYLVANIA ELECTRIC )
COMPANY, )
                            )     CIVIL ACTION NO. 3:2007-cv-44
           Appellee, )
                            )
      v.                      )     Appeal from Bankruptcy No. 05-73035 BM
                            )
UNITED FOUNDRY CO., INC., )
                            )     JUDGE KIM R. GIBSON
                            )
           Appellant. )
                            )
                            )
                            )

## MEMORANDUM OPINION AND ORDER

**GIBSON, J.**

      This Court must decide whether the Bankruptcy Court erred in holding that an electrical

services contract was assumable and assignable during bankruptcy proceedings. This matter comes

before the Court on an appeal from the Bankruptcy Court's November 2, 2006 Memorandum

Opinion.[1] In that Opinion, the Bankruptcy Court granted Appellant United Foundry Co., Inc.

permission to assume, and then assign to another entity, an executory contract for curtailable electric

service to be provided by Appellee Pennsylvania Electric Company ("Penelec").

      After full consideration of the arguments presented and the relevant law, the Court finds that

the Bankruptcy Court clearly erred in making factual findings and inferences from those findings;

furthermore, such errors irreparably distorted the Bankruptcy Court's legal rationale for its holding;

consequently this Court will reverse the Bankruptcy Court's denial of Penelec's Objection, and will

remand the case for further adjudication regarding the central issue of the assumability and

---

[1] *In re United Foundry*, 05:73035 (Bankr. W.D. Pa. Nov. 2, 2006) (available at 3:07-cv-44, Doc. No. 1, ex. 4).

assignability of the at-issue contract.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The underlying facts, procedural history, and legal issues are well-known to the parties and mostly undisputed; consequently, this Court will only briefly reiterate the factual and procedural aspects of this case to the extent they are directly relevant to this appeal. Furthermore, the facts have generally been well-presented in the Bankruptcy Court orders and opinions, and in the parties' filings.

The original business relationship between Appellant and Appellee is fairly simple: United Foundry purchased electricity from Penelec. Over time, the terms of that business relationship were defined by three separate but similar contractual agreements. Furthermore, these contracts provided that Penelec's provision of services was expressly subject to the terms of another document, the Tariff of Rates, Rules, and Regulations ("Tariffs") for electric light and power service on file with the Public Utility Commission ("PUC"). Penelec was legally bound by the terms of the Tariffs in its interactions and dealings with all of its customers.

In 1991, United Foundry and Penelec entered into a contract involving a curtailable service program, whereby United Foundry agreed to voluntarily reduce its electrical demand upon notification from Penelec of a need for reduced usage. In exchange for this flexibility in power usage, United Foundry received credits on its electricity bill.[2]

As changing business conditions obviated the initial rational for the program, the availability

---

[2]*See In re United Foundry*, 05:73035, at *2-3 (Bankr. W.D. Pa. Nov. 2, 2006).

2

of curtailable service agreements was restricted, pursuant to the terms of the Tariffs; by 1999, new customers were not allowed to enter into such agreements. However, under the Tariffs, previous Penelec customers holding valid curtailable service contracts were exempted from the restriction, and were allowed to continue under the terms of their curtailable contracts. Furthermore, Rule 20 of the Tariffs specifically provided that certain former Penelec customers would be allowed to re-enter curtailable service contracts; such customers included those who, for a period of time, chose to obtain service from another utility company, or EGS, but later returned to purchasing electricity from Penelec.

From February 25, 2000 to May 24, 2001, United Foundry obtained electricity from another EGS. In May, 2001, United Foundry returned to purchasing from Penelec. The parties then entered into a "Contract for Reactivation of Curtailable Service Pennsylvania Electric Company" (the "2001 Contract"). Solely because of its status as a previous customer, United Foundry was eligible under the Tariff to re-enter a curtailable service contract with Penelec. In 2004, the parties re-issued essentially the same contract, with amended contact information. This Opinion will refer to the 2004 Contract as "the Contract." The Contract provided that United Foundry could not assign the contract without first receiving Penelec's written consent; however, the Contract specified that Penelec could not unreasonably withhold such consent.

On October 15, 2005, United Foundry filed a voluntary petition for reorganization with the United States Bankruptcy Court for the Western District of Pennsylvania, pursuant to Chapter 11 of the Bankruptcy Reform Act of 1978, 11 U.S.C. §§ 1101-1174. United Foundry listed Penelec as a

3

creditor holding a General Unsecured Claim on Schedule F.

On April 17, 2006, United Foundry filed a "Motion of Debtor-in-Possession to Sell Non-

Residential Realty and Tangible and Intangible Personalty Free and Clear of Liens, Claims, Charges

or Encumbrances of Third Parties Against the Debtor's Interest in the Same, as Well as for

Assumption and Assignment of Contract for Curtailment of Electrical Services"(the "Sale Motion").[3]

In the Sale Motion, United Foundry requested Court approval to assume and assign the Contract to

UF Acquisition Co. *See id.* Specifically, United Foundry stated as follows:

> The Debtor is a party to an executory contract with Respondent,
> Penelec, affording the Debtor certain price differentials on the electric
> energy provided by Penelec, pursuant to Contract for Reactivation of
> Curtailable Service, effective as of August 4, 2004, which was agreed
> to and executed by Penelec September 28, 2004, the provisions of
> which are incorporated herein by reference as fully as if restated at
> length.

Doc. No. 1, Ex. 1, ¶ 33.

Penelec objected to this Motion, arguing that the Contract was neither assumable nor

assignable, because, among other reasons, applicable law did not permit either the assumption of the

Contract by the debtor-in-possession, or the assignment of the Contract to UF Acquisition Co.[4]

While the Bankruptcy Court acted quickly to adopt the majority of the Sale Motion, it

expressly reserved the Penelec-United Foundry contract issue for later determination. On August

---

[3]Motion of United Foundry, *In re United Foundry*, No. 05-73035 (Bankr. W.D. Pa. Apr. 17, 2006) (available at 3:07-cv-44, Doc. No. 1, ex. 1).

[4]Objection of Penelec, *In re United Foundry*, No. 05-73035 (Bankr. W.D. Pa. May 10, 2006).

4

25, 2006, Penelec and United Foundry filed a joint Stipulation of Facts relative to this issue.[5] Importantly, this stipulation included, as an attachment, the entirety of Rule 20 of the Tariffs. In total, Rule 20 as attached constituted slightly more than six pages of text, which text included the following statement near the beginning: "3. Customers who elect to receive generation service from an EGS and thereafter return to the Company as a Full Service Customer shall be entitled to receive Curtailable credits on the amount of the load previously subject to Curtailable credits." *Id.* The Bankruptcy Court held a hearing on this matter on August 25, 2006. Penelec submitted a supplemental brief on September 1, 2006. On September 8, 2006, United Foundry submitted its supplemental brief.

On November 2, 2006, the Bankruptcy Court issued a Memorandum Opinion and Order[6] ("Order Denying Objection to Sale") denying Penelec's Objection to the Sale Motion. In this Opinion, the Bankruptcy Court held that it did not need to refer any issues to PUC, and that applicable law did not preclude United Foundry's assumption of the Contract and consequent assignment to UF Acquisition Co. *Id.* at 6-17.

In response to that adverse ruling, Penelec filed a motion[7] (hereinafter "Penelec's Motion to

[5]Stipulation of Facts, *In re United Foundry*, No. 05-73035 (Bankr. W.D. Pa. Aug. 25, 2006).

[6]Memorandum Opinion, *In re United Foundry*, 3:07-cv-44 (Bankr. W.D. Pa. Nov. 2, 2006) (available at Doc. No. 1, ex. 4).

[7]"Motion of Pennsylvania Electric Company, Pursuant to Rules 9023 and 9024 of the Federal Rules of Bankruptcy Procedure to Reconsider and Modify Memorandum Opinion and Order Regarding Pennsylvania Electric Company's Objection to the Motion of Debtor-In Possession to Sell Non-Residential Realty and Tangible and Intangible Personalty Free and Clear of Liens, Claims, Charges or Encumbrances of Third Parties Against the Debtor's Interest in the Same, as Well as for Assumption and Assignment of Contract for Curtailment of Electrical Services", *In re United Foundry*, 3:07-cv-44 (Bankr. W.D. Pa. Nov. 10, 2006).

Reconsider") asking the Bankruptcy Court to reconsider and modify the Order Denying Objection to Sale. Doc. No. 1, ex. 5.  On January 8, 2007, the Bankruptcy Court denied this Motion ("Order Denying Motion for Reconsideration.").[8]  In this Order, the Bankruptcy Court did not address the substance of Penelec's Motion, instead expressing frustration that an apparently relevant provision of the Tariff "was not called to the court's attention the first time around." *Id.* at 2.

Penelec now appeals the Bankruptcy Court's adverse decision[9] to its objection to the sale of the Contract.

## II. ARGUMENTS ON APPEAL

Penelec raises the following issues as grounds for its appeal: 1) that "the Bankruptcy Court committed reversible error in refusing to refer the matter of whether Rule 20 of Pennsylvania Electric Company's Electric Service Tariff precluded the assignment of the 'Contract for Reactivation of Curtailable Service Pennsylvania Electric Company (the 'Contract') from the Debtor to UF Acquisition Co. to the Pennsylvania Public Utility Commission pursuant to the doctrine of primary jurisdiction"; 2) that the Bankruptcy Court committed reversible error in finding "that the Debtor did not qualify for curtailable service from Appellant in June 2001 because the Debtor's identity in June 2001 was not material to Appellant's decision to contract with the Debtor in June, 2001"; 3) that the Bankruptcy Court committed reversible error in "holding that 11 U.S.C. § 365(c)(1) did not preclude the Appellant from assuming and assigning the Contract to the Purchaser because

---

[8]Order of Court, *In re United Foundry*, 05:73035 (Bankr. W.D. Pa. Jan. 8, 2007) (Doc. No. 1, ex. 6).

[9]While Penelec styles its appeal as an appeal of two separate orders, the heart of the appeal rests upon the Bankruptcy Court's denial of Penelec's objection to the assumability and assignability of the at-issue curtailable service contract.

6

applicable state law set forth in Rule 20 of Appellant's Tariff excuses the Appellant from performing under the Contract with any entity that is not an existing or returning customer of curtailable services at the subject location"; 4) that the Bankruptcy Court committed reversible error "by denying Appellant's motion to reconsider the November 2, 2006 Order because of the Bankruptcy Court's failure to consider the relevant portions of Rule 20 of the Tariff entered into evidence under a stipulation of facts . . . ." Doc. No. 2, p. 7.

United Foundry disputes Penelec's positions on each of these issues, but generally subjugates substantive arguments beneath its position that Penelec waived the ability to raise certain relevant arguments. *See*, *e.g.*, Doc. No. 6, p. 8 ("The Debtor objected to reconsideration, and asserted that it was not the Court's duty or obligation to ferret through every page and term of every exhibit introduced. United argued that to the extent that a term or phrase of an Exhibit is relevant, it is the obligation of the party to bring that provision to the attention of the fact finder, and that as Penelec did not point out that provision of the Tariff either in the Stipulation or its Brief or Supplementary Brief, and only did so, for the first time, in the Motion For Reconsideration, that the subject provision cannot be the subject or basis of the Motion For Reconsideration.").

## III. JURISDICTION and STANDARD OF REVIEW

This Court possesses jurisdiction over this appeal pursuant to 28 U.S.C. § 158(a). District courts act as appellate courts in reviewing Bankruptcy Judge determinations, and "review the Bankruptcy Court's legal determinations *de novo*, its factual findings for clear error, and its exercise of discretion for abuse thereof." *Manus Corp. v. NRG Energy, Inc.*, 188 F.3d 116, 122 (3d Cir. 1999)

7

(citation omitted); *see also In re Schick*, 418 F.3d 321, 323 (3d Cir. 2005) (explaining that when adjudicating a bankruptcy appeal, a district court "review[s] findings of fact for clear error and exercise[s] plenary review over questions of law."). With mixed questions of law and fact, this Court must accept the Bankruptcy Court's findings regarding historical or narrative facts, unless such facts are clearly erroneous; as to legal precepts and applications of those precepts to the historical facts, this Court exercises plenary review. *Mellon Bank v. Metro. Comms., Inc.*, 197 F.3d 76, 80 (3d Cir. 1999).

## IV. DISCUSSION

This Court will address only those issues specifically raised on Penelec's appeal.

### A. The Bankruptcy Court Did Not Err in Failing to Refer Rule 20 Issue to Pennsylvania PUC

Penelec first argues that the Bankruptcy Court should have applied the doctrine of primary jurisdiction and referred, to PUC, the legal determination regarding how Rule 20 affects the assumability and assignability of the contract. For several reasons, this Court does not agree with Penelec's argument.

"Primary jurisdiction 'applies where a claim is originally cognizable in the courts and comes into play whenever enforcement of the claim requires resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body.'" *MCI Telecomms. Corp. v. Teleconcepts, Inc.*, 71 F.3d 1086, 1103 (3d Cir. 1995) (quoting *Greate Bay Hotel & Casino v. Tose*, 34 F.3d 1227, 1230 n.5 (3d Cir. 1994)); *see also Richman Bros. Records, Inc. v. U.S. Sprint Comm. Co.*, 953 F.2d 1431, 1435, n. 3 (3d Cir.1991) ("Primary jurisdiction is a

8

doctrine that requires a court to transfer an issue within a case that involves expert administrative discretion to the federal administrative agency charged with exercising that discretion for initial decision." ); *see also United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 63-64, 77 S. Ct. 161, 1 L. Ed.2d 126 (1956) ("No fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation.")

In considering whether to apply the doctrine of primary jurisdiction, Courts frequently consider the following four factors: (1) whether the question is within the conventional experience of judges, or whether it involves technical or policy considerations within the agency's particular field of expertise; (2) whether the question is particularly within the agency's discretion; (3) whether a substantial danger of inconsistent rulings exists; and (4) whether the parties have previously made a prior application to the agency. *See, e.g.*, *Global NAPS v. Bell Atlantic-New Jersey*, 287 F. Supp. 2d 532, 549 (D. N.J.2003).

Under the first factor of the analysis, Penelec argues that interpretation of Rule 20 is "not within the conventional experience of bankruptcy judges." Doc. No. 2, p. 16. This Court disagrees. While there are likely some technical or policy considerations within PUC's particular field of expertise, this matter is more properly viewed as a contractual interpretation in the context of a bankruptcy proceeding, which is precisely within the conventional experience of bankruptcy judges. The appealed issue involves interpreting contractual language, which is not only within the historic competence of judges, but is in fact a judge's primary area of competence.

9

Penelec next argues that the application of Rule 20 is "clearly within the PUC's jurisdiction .... " Doc. No. 2, p. 16. The Court finds, based upon the record, that PUC indeed has an important role to play in utility-related issues in Pennsylvania; however, this particular issue, as arising in a bankruptcy proceeding, is not "peculiarly" within PUC's jurisdiction. For primary jurisdiction to apply in this matter, sufficient reasons should exist such that only PUC could handle the matter. The reasons offered by Penelec are insufficiently compelling. The Third Circuit directs that where the area is one in which the courts are well-suited to determine the issue, a court should not "abdicate its responsibility." *MCI Telecomms Corp.*, 71 F.3d at 1104 (3d Cir.1995) (quoting *Elkin v. Bell Tel. Co.*, 420 A.2d 371, 377). Further, Penelec argues that allowing PUC to interpret the issue would limit the danger of inconsistent rulings; however, the Court is satisfied that any such danger is sufficiently resolved by proper judicial adjudication. As to the fourth factor, Penelec acknowledges that it is "not aware of any application being made by the Appellee or the Purchaser to the Pennsylvania PUC." Doc. No. 2, p. 17. Consequently, the Fourth factor did not favor a referral.

Having conducted an analysis of the above four factors, the Court finds no compelling reason to apply the doctrine of Primary Jurisdiction; consequently, the Bankruptcy Court did not err in refusing to refer the matter to PUC. This finding is consistent with Third Circuit law. *See MCI Telecomms Corp.*, 71 F.3d at 1104 (3d Cir. 1995) (commending courts to "not be too hasty in referring a matter to an agency" given the jurisprudential significance of a court retaining its jurisdiction when proper) (quoting *Elkin v. Bell Tel. Co.*, 420 A.2d 371, 377)).

Furthermore, as United Foundry points out, the Bankruptcy Court was responsible for

10

considering the effect of 11 U.S.C. § 365 regarding the propriety of assumption and assignment; the power given to a bankruptcy court to authorize assumption of an agreement such as the one at issue is separate and distinct from PUC's authority. The Bankruptcy Court explained: "A determination by the PUC that debtor may not assign the above to UF Acquisition in light of Tariff 20 would not necessarily be dispositive in this bankruptcy case. It would not necessarily follow that debtor may not assign the contract to UF Acquisition under Section 365 of the Bankruptcy code. Certain contracts which may not be assigned under Pennsylvania law nonetheless may be assigned under Section 365. It is for this court alone, not the PUC, to make such a determination with respect to Section 365." Order Denying Motion for Reconsideration, p. 9.

Upon review, the Court finds that the Bankruptcy Court did not commit reversible error in refusing to refer this particular question to the PUC.

**B. The Bankruptcy Court Erred in Finding That United Foundry Did Not Qualify for Curtailable Service in June, 2001, and that United Foundry's Identity in June 2001 Was Immaterial to Penelec's Decision to Enter into the 2001 Contract.**

In its appeal briefing, Penelec attaches the label "clear error" to the following two Bankruptcy Court findings: 1) that United Foundry was not entitled to curtailable credits in May 2001; and 2) that the identity of United Foundry was not material to the formation of the contract is also clearly erroneous.[10] This Court agrees, and because the Bankruptcy Court's legal holding expressly cited and indeed depended solely upon these errant factual findings and assumptions, the Court will

---

[10]In its Order Denying Objection to Sale, the Bankruptcy Court held that the parties' stipulated facts led to the conclusion that United Foundry was not eligible for curtailable credits at the time of the formation of the 2001 contract, and that the identity of United Foundry was not material to the formation of the 2001 contract (and consequently the 2004 Contract also).

remand the matter to the Bankruptcy Court for renewed consideration. This Court makes no comment as to the proper final result of the ultimate issue, which, of course, is the disputed assumability and assignability of the Contract. Rather, this Court finds that because the Bankruptcy Court's reasoning relies upon clearly erroneous facts, the Bankruptcy Court must re-assess the situation with a correct understanding of the facts of the case, including the entirety of Rule 20, and the obvious materiality of United Foundry's identity with respect to the 2001 contract.

The Order Denying Objection to Sale sets out an explanation of the import of 11 U.S.C. § 365, describing the occasional confusion caused by the language in two separate subdivisions.[11] Generally, subject to various exceptions, Section 365 permits the trustee, and, by extension, debtor-in-possession,[12] to assume or reject any executory contract of the debtor. 11 U.S.C. § 365(a). Assumption of an executory contract must precede assignment. 11 U.S.C. § 365(f)(2)(A). Section 365 allows trustees, or debtors-in-possession, to properly maximize the value of the bankrupt estate by "assuming executory contracts that benefit the estate and rejecting those that do not." *In re Rickel Home Ctrs., Inc.*, 209 F.3d 291, 298 (3d Cir. 2000). Section 365(f)(1) states: "Except as provided

---

[11]The Bankruptcy Court began its analysis with a discussion of the applicable Bankruptcy law: 'By its terms, subsection 365(c)(1) excuses the non-party debtor party to an executory contract from rendering performance to or accepting performance from the would-be assignee when *applicable law* excuses it from doing so with respect to an entity different from the one with which the non-debtor party initially contracted. Order Denying Objection to Sale, p. 12 (citing *RCI Tech. Corp. v. Sunterra Corp.*, 361 F.3d 257, 266 (4th Cir. 2004).

Shortly thereafter, the Bankruptcy Court explains: "Subsection 365(c)(1) comes into play only when the 'applicable law' in question precludes assignment on the rationale that the *identity* of the party to the initial contract other than the non-debtor party was *material* to the contract. [citing cases] If the identity of the party with whom the non-debtor contracted –in this instance–was not material to formation of that contract, § 365(c)(1) does not apply." *Id.* at 14.

[12]See 11 U.S.C. § 1107(a) (granting debtor in possession virtually the same rights and powers as trustee in Chapter 11 proceedings).

12

in subsections (b) and (c) of this section, notwithstanding a provision in an executory contract or

unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the

assignment of such contract or lease, the trustee may assign such contract or lease under paragraph

(2) of this subsection."

Section 365(c)(1)(A)-(B) states as follows:

> (c) The trustee may not assume or assign any executory contract or
> unexpired lease of the debtor, whether or not such contract or lease
> prohibits or restricts assignment of rights or delegation of duties, if–
>
> (1)(A) applicable law excuses a party, other than the debtor, to such
> contract or lease from accepting performance from or rendering
> performance to an entity other than the debtor or the debtor in
> possession, whether or not such contract or lease prohibits or restricts
> assignment of rights or delegation of duties; and
>
> (B) such party does not consent to such assumption or assignment;

As properly noted by the Bankruptcy Court, analysis under Section 365(c)(1) proceeds by

determining why an "applicable law" would preclude assignment of the contract; where such

preclusion would occur on the "rationale that the *identity* of the party to the initial contract other than

the non-debtor party was *material* to the contract." Order Denying Objection to Sale, pp. 13-14. The

basic policy goal in place in Section 365 is attempting to allow the debtor to realize the correct value

of its estate, while also providing some protection to the nondebtor contracting party.

Interestingly, in the time since the Bankruptcy Court's opinion, the Supreme Court, in a

denial of *cert*, commented on the issue of the power of a debtor-in-possession to assume executory

contracts, and describing a Circuit split as to the proper test:

> Section 365 gives the debtor-in-possession the power to

13

assume–that is, to continue to receive the benefits of, while also continuing to perform its obligations under–the debtor's leases, ongoing performance contracts, and licenses to use the property of others. This power is withdrawn, however, if 'applicable law excuses a party, other than the debtor, to [an executory contract] from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and . . . such party does not consent to such assumption or assignment . . . ." §§ 365(c)(1)(A)-(b).

According to the Court of Appeals for the Ninth Circuit, this language means that a debtor-in-possession may assume an executory contract only if hypothetically it might assign that contract to a third party. That is to say, if the debtor-in-possession lacks hypothetical authority to assign a contract, then it may not assume it–even if the debtor-in-possession has no actual intention of assigning the contract to another. *In re Catapult Entertainment, Inc.*, 165 F.3d 747 (9th Cir. 1999). The so-called "hypothetical test" is preferred by a majority of the other Courts of Appeals that have addressed this question. (citing cases, including *In re West Electronics, Inc.*, 852 F.2d 79 (3d Cir. 1988).

*N.C.P. Marketing Group, Inc. V. BG Star Productions, Inc.*, 129 S. Ct. 1577, 173 L. Ed. 2d 1028 (2009).

The Bankruptcy Court noted Section 365's general policy of favoring assumption and assignment of executory contracts, and also explained Section 365(c)(1)'s limitations on that policy. Specifically, Section 365(c)(1) proscribes assignment where the non-debtor party has some basis, in the applicable law, for properly refusing to "accept[] performance from or render[] performance to an entity other than the debtor or the debtor in possession." Order Denying Objection to Sale, p. 13.

However, despite the Bankruptcy Court's admirable efforts to grapple with Section 365, the

Bankruptcy Court's clear factual errors interrupted the possibility of a correct legal analysis.

The Bankruptcy Court expressly stated that it relied upon its understanding of Rule 20 of the Tariff, and the facts as follows: that United Foundry "did not qualify for curtailable service when it again began receiving curtailable service from Penelec in June of 2001. Debtor at that time was not an *existing* full service customer at an *existing* service location at a then-*existing* load level." Order Denying Objection to Sale, p. 16. As will be discussed in greater detail *infra*, this passage illustrates the Bankruptcy Court's clear misunderstanding of Rule 20 and the related facts.

### 1. **Bankruptcy Court Misapprehended the Factual Basis for the "Applicable Law" Relevant to the Contract**

Shortly after its recitation of the nuances of Section 365, the Bankruptcy Court explains that Penelec had pointed to Rule 20 of the Tariffs, and that "Tariff 20 has the force of law and is binding on the customer as well as the utility company." *Id.* (citing case). The Bankruptcy Court then states:

> The facts to which debtor and Penelec have stipulated lead us to conclude that the identity of debtor, as characterized by Tariff 20, was *not* material to formation of the contract debtor now seeks to assume and assign to UF Acquisition. We base our conclusion on Penelec's past conduct vis-a-vis debtor.
>
> Debtor initially entered into a curtailable service contract with Penelec in May of 1991, when Penelec approved debtor's first application for such service. Said contract was entered into prior to January 1, 1999, the date on which Tariff 20 cut off a new customer's eligibility for curtailable service. It remained in effect until February 25, 2000, when debtor decided to look elsewhere for a more favorable rate for curtailable service.
>
> Debtor was without a contract for curtailable service from Penelec for approximately fifteen months. On May 29, 2001, however, debtor submitted a document to Penelec entitled "Contract for Reactivation of Curtailable Service." Penelec accepted the document on June 2, 2001, approximately twenty-five months *after*

the January 1, 1999 deadline for qualifying for curtailable service
from Penelec.

      If we apply Tariff 20 as Penelec would have us do, debtor did
*not* qualify for curtailable service when it again began receiving
curtailable service from Penelec in June of 2001. Debtor at that time
was *not* an *existing* full service customer at an *existing* service
location at a then-*existing* load level.

      Penelec's decision to reactive [sic] curtailable service to
debtor in June of 2001 in spite of this restriction leads us to conclude
that debtor's identity as an existing curtailable service customer at an
existing service location at an existing load level was *not* material to
the contract for curtailable service entered into at that time. Were
debtor's identity as such a customer truly material to a formation of
a contract, for curtailable service, we would expect Penelec to have
rejected rather than accepted debtor's request for reactivation of
curtailable service . . . .

      Contrary to what Penelec asserts, we conclude in light of the
foregoing that debtor's identity was not material to Penelec's decision
to contract with debtor in June of 2001 for curtailable service. To
find that debtor's identity was material for purposes of § 365(c)(1) in
light of Tariff 20 would require us to run roughshod over the
language of the tariff.

      It in turn follows from this conclusion that the exception to
assumption and assignment of an executory contract found at §
365(c)(1) does not apply here and does [not] prevent debtor from
assuming and assigning the curtailable service contract that was in
effect when debtor filed its bankruptcy petition. Subsection 365(c)(1)
does not override § 365(a) in this instance. Debtor may, in short,
assume the contract and assign it to UF Acquisition in accordance
with § 365(a) of the Bankruptcy Code.

Order Denying Objection to Sale, pp. 15-17.

      Numerous problems are evident in the above passage. First and foremost, the Bankruptcy

Court misread Rule 20 of the Tariffs, which Rule expressly allowed and required Penelec to offer

curtailable service to "[c]ustomers who elect to receive generation service from an EGS and

thereafter return to the Company as a Full Service Customer shall be entitled to receive Curtailable

credits on the amount of the load previously subject to Curtailable credits."[13]  The Bankruptcy Court

apparently believed that the only relevant section of Rule 20 was the following: "The availability of

this Rule 20 to Customers has been restricted since March 25, 1994.  The availability of this Rule

20 shall be restricted as of January 1, 1999 to existing Full Service Curtailable Customers at existing

service locations at existing Curtailable load levels except **during the conditions stated in this**

**Rule.**" (emphasis added).[14]  The Bankruptcy Court apparently missed the significance of those last

seven words, and failed to read or apply the relevant stated condition obviously applicable in this

instance.  Specifically, the Bankruptcy Court did not appreciate that at the time of the Contract's

formation, Rule 20 offered an explicit exemption to previous customers who had formerly held

curtailable service contracts.

     Based upon this Court's assessment of the undisputed facts, United Foundry fit within the

plain language of the Rule 20 express-stated condition, and the applicability of that condition was

the sole reason why United Foundry was again able to obtain a curtailable service contract in 2001.

In other words, the specific identity of United Foundry was material, because United Foundry's

status as a previous customer was essential to its ability to enter the 2001 contract and ultimately the

2004 contract.  In its attempt to avoid "run[ning] roughshod over the language of the tariff", the

Bankruptcy Court appears to have not read beyond the first paragraph of Rule 20.

     As a consequence of this initial error, the Bankruptcy Court subsequently assumed that Rule

---

[13]Stipulation of Facts, *In re United Foundry*, No. 05-73035 (Bankr. W.D. Pa. Aug. 25, 2006).

[14]Stipulation of Facts, *In re United Foundry*, No. 05-73035 (Bankr. W.D. Pa. Aug. 25, 2006).

17

20 therefore meant that somehow United Foundry's specific status was entirely non-relevant to the 2001 contract formation. This is clear error. The Bankruptcy Court leaves its reasoning somewhat unclear as to why it concluded that the debtor's identity was not material. *See* Order Denying Objection to Sale, p. 16 ("Were debtor's identity as such a customer truly material to a formation of a contract, for curtailable service, we would expect Penelec to have rejected rather than accepted debtor's request for reactivation of curtailable service . . . ."). The Bankruptcy Court erred in making the determination of immateriality on the basis of its factually unsupported "expectation" regarding a company's motivations for contractual decisions.

While springing from a mistaken reading of Rule 20, the Bankruptcy Court's factual interpretation of the significance of the debtor's identity was the apparent sole basis for the Bankruptcy Court's decision that the curtailable service contract was assumable and assignable. *See* Order Denying Objection to Sale, p. 16 ("It in turn follows from this conclusion that the exception to assumption and assignment of an executory contract found at § 365(c)(1) does not apply here and does [not] prevent debtor from assuming and assigning the curtailable service contract that was in effect when debtor filed its bankruptcy petition.").

In short, the Bankruptcy Court erred in incorrectly assuming that the identity of United Foundry was not material to the formation of its 2001 and 2004 contracts with Penelec. Since this errant assumption was the sole basis for the Bankruptcy Court's consequent legal analysis, that analysis is also errant. This Court makes no comment on the correctness of the actual result in this matter; in fact, it may well be that the contract is assumable and assignable based upon other

18

rationales consistent with Section 365. However, for the present result to ultimately stand, it must be supported by alternative reasons. In light of the Bankruptcy Court's clear error, this Court elects to remand this matter for further consideration by the Bankruptcy Court, with instructions to re-assess the assumability and assignability of the Contract in light of the actual facts in this case, by considering the impact of Rule 20 in its entirety.

Because the Bankruptcy Court analyzed this legal issue by applying clearly erroneous facts and drawing unfounded inferences from those erroneous facts, this Court will remand the matter to the Bankruptcy Court for reconsideration of this issue.

## C. Penelec's Final Two Grounds for Appeal are Moot

In its appeal briefing, Penelec also challenged the Bankruptcy Court's ultimate decision in finding that United Foundry could assume and assign the Contract to UF Acquisition Co. However, this Court will not assess the ultimate propriety of the finding of assumability and assignability; the procedural posture of the case counsels against such definitive action. Because the Bankruptcy Court misinterpreted the factual setting, it in fact has not yet properly analyzed this question at all; therefore, the Court will remand for proceedings not inconsistent with this opinion, wherein the Bankruptcy Court will re-analyze this question, having corrected its clearly erroneous findings regarding Rule 20 and the immateriality of United Foundry's identity in 2001. Again, this Court expresses no insight or prediction as to the appropriate outcome of this analysis; such analysis may require further development of the factual record, which is more aptly accomplished by the Bankruptcy Court, which is more familiar with the entire scope of this case.

19

Second, Penelec also raised as grounds for appeal the Bankruptcy Court's putatively inappropriate refusal to reconsider and modify its Order Denying Objection to Sale. Again, in light of this Court's above decisions, this grounds for appeal is now moot. The Court notes that the Bankruptcy Court could have properly used the Motion for Reconsideration as a vehicle for correcting its clearly erroneous assumptions and inferences. When presented with an explicit elucidation of those errors, the Bankruptcy Court responded by blaming Penelec's briefing:

> [W]e are not persuaded that the above finding of fact was clearly erroneous and that manifest injustice would result if the above order is not modified or amended. To begin with, we are not convinced that subsection 3 of Rule 20 would require alteration of the above order. Even if said provision did require amendment of the disputed finding of fact, said provision was not called to the Court's attention the first time around. When the above decision was pending, Penelec simply threw portions of Rule 20 on the table and invited the court to 'Go fish!' We seriously question that had a jury reached a verdict under the same circumstances, the resulting judgment would have to be altered or amended. Penelec should have, but did not, explain what it now considers to be the significance of Rule 20.3.

Order Denying Motion for Reconsideration, p. 2.

In attempting to assess the legal impact of the overly colloquial tone of the Bankruptcy Court's choice of words, the Court concludes that the Bankruptcy Court must have ruled that Penelec committed some form of waiver by failing to expressly highlight the particular section of Rule 20 of the Tariff. This rationale for denying the motion for reconsideration is misplaced. Litigants do not always have the benefit of being able to predict a Court's precise future reasoning; consequently, they cannot be expected to have the foresight to expressly highlight every single conceivable fact that

20

could support that unknown reasoning.[15]  Failure to expressly discuss a factual matter attached as an exhibit to briefing does not constitute any type of waiver as to that fact.  Assessing this case as a whole, this Court does not know how Penelec could possibly have predicted that the Bankruptcy Court would base its decision on an assumption and an inference from that assumption. Furthermore, the Bankruptcy Court expressly rejected Penelec's request for PUC to assist with the Tariff interpretation; then, later, the Bankruptcy Court disclaims responsibility for awareness of the Rule's operative provisions. Order Denying Motion for Reconsideration, p. 2 ("Even if said provision did require amendment of the disputed finding of fact, said provision was not called to the Court's attention the first time around.").

The Court is unaware of any legal grounds for finding that a party, attaching the language of a governing contract to its briefing, somehow waives the existence of dispositive provisions of that contract simply for not expressly mentioning those provisions in its briefing.  The only ground cited by the Bankruptcy Court for this waiver theory is an untenable analogy to a jury verdict; in short, the Bankruptcy Court's waiver theory is not supported by either the record or the law.  Obviously, unending alternative strategic arguments need not be considered in the context of a motion for reconsideration; however, a motion for reconsideration essentially exists for the purpose present in this case—to allow the Bankruptcy Court to correct its clear error in missing an operative provision of Rule 20, and consequently its errant factual finding that United Foundry' identity was not material

---

[15]Furthermore, litigants face specific page constraints, time constraints, and the inherent restraints imposed by strategic considerations. After a judicial decision has been put forth, it is easy to pick holes in a litigant's briefing.

21

to the contract formation.

## IV. CONCLUSION

In conclusion, this Court finds that the Bankruptcy Court committed reversible error as outlined above. Furthermore, since the Bankruptcy Court did not use the appropriate information in analyzing the assumability and assignability of the at-issue contract, this Court will remand the matter to the Bankruptcy Court for further proceedings not inconsistent with this Memorandum Opinion. An appropriate Order follows.

## ORDER

**AND NOW**, this 11th day of August, 2009, in accordance with the foregoing Memorandum Opinion, IT IS HEREBY ORDERED THAT the decision of the Bankruptcy Court is **Reversed**, and **Remanded** for further adjudication, including a re-assessment of the central question in this matter, which is the assumability and assignability of the at-issue Contract.

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**